

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,100

**JOHN HENRY RAMIREZ, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON DIRECT APPEAL FROM CAUSE NO. 04-CR-3453-C
## IN THE 94TH DISTRICT COURT
## NUECES COUNTY

**MEYERS, J., delivered the opinion of the unanimous Court.**

## O P I N I O N

Appellant was convicted in December 2008 of capital murder. TEX. PENAL CODE

ANN. § 19.03(a)(2). Based on the jury's answers to the special issues set forth in the

Texas Code of Criminal Procedure, Article 37.071, Sections 2(b) and 2(e), the trial judge

sentenced appellant to death. Art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). After reviewing appellant's six points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

Appellant was charged with intentionally causing the death of Pablo Castro by stabbing him with a knife while in the course of committing or attempting to commit the offense of robbery. Lydia Salinas testified that she had known Castro for ten to fifteen years. She was the manager and cashier of Times Market, the convenience store where Castro worked, and they regularly worked the night shift together. Castro would come to work around 4:00 p.m. or 5:00 p.m., and Salinas would arrive at 6:00 p.m. They worked until the store closed at midnight, and they usually took turns buying dinner. On the night of July 19, 2004, Castro told Salinas that he had only a dollar, so she bought them both dinner. Salinas's sister-in-law brought it to the store for them. She told Salinas that there was a van parked in the area where she usually parked. After she left, Salinas and Castro finished eating. A short time later, a young Hispanic woman came into the store to use the bathroom. Salinas remembered her because she asked to use the "facilities," which was unusual. Salinas later identified the woman as Angela Rodriguez.

---

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

As closing time approached, Castro told Salinas that he was going out to empty the trash. Salinas was busy counting money at the cash register. A few minutes later, a girl came in and told her that there was a bleeding man lying in the parking lot. Salinas thought that Castro had probably come back inside by then and was working in the back of the store, so she called out to let him know that she was going outside. She stepped outside and confirmed that someone was lying in the parking lot, and then she went back in and called 9-1-1. She yelled for Castro to come to the front of the store before she went back outside to see if she could help. She took a closer look at the man in the parking lot and realized that he was Castro. She screamed and started toward him, but a neighbor and some people who had come from the car wash next door held her back and told her that he was dead.

Mariano Cervantes testified that he and Kashif Butt worked together at another store that closed at 11:00 p.m. After they closed up their store for the night, they drove to the car wash located next to Times Market. As they were getting ready to wash their cars, Butt called Cervantes's attention to a fight that was going on in the Times Market parking lot. Cervantes saw a young man and woman standing on either side of an "older gentleman" and hitting him. The older man looked like he was trying to get out of the way. Cervantes testified that he recognized the young man because they had gone to the same school, but he did not recognize the woman. Cervantes and Butt started toward the parking lot to see if they could help the older man. Cervantes saw the older man fall, and

he saw the young man and woman get into two separate vans.  He did not see anyone reach into the victim's pockets.  The assailants were gone by the time he reached the victim.  Cervantes had not seen a knife during the fight, but when the victim tilted his head back, Cervantes could see a large bloody gash on his throat.  The victim was conscious when Cervantes first tried to talk to him, but he was gurgling and spitting out blood, and soon he closed his eyes and stopped responding.  Cervantes believed he was dead.

After reviewing his statement to police, Cervantes acknowledged that he had told police that he saw the woman trying to reach into the victim's pockets.  He also acknowledged that his statement did not include the information that he recognized the man who attacked the victim.  He further acknowledged that he was not able to positively identify Rodriguez when police officers took him to see her later that evening.  He recalled saying that the person they showed him looked like her but that he was not "a hundred percent sure."

Kashif Butt testified that, after work, he and Cervantes went to the car wash next to Times Market.  They were about to start washing their cars when Butt heard sounds of arguing or fighting coming from the store parking lot.  He saw the victim being beaten up by a man and woman.  He did not see a weapon.  He described the assailants as being about 5' 6" tall and Hispanic.  The man was "built," and the woman was skinny.  The victim was about 5' 6", in his 40's, and heavy.  The assailants were punching and kicking

him, and the victim was trying to block their punches and kicks. After he fell, the assailants kept beating him and kicking him. Eventually they stopped and went through his pockets, got something out, and then left. Butt saw them get into a big red Ford van. A third person was sitting in the driver's seat. Upon reviewing his statement to police, Butt remembered that there was a second van, but he still recalled that both assailants got into the van with the waiting driver. He did not recall what happened to the second van. The victim was barely alive when Butt and Cervantes reached him. Butt saw that the victim was bleeding badly from his throat.

On cross-examination, Butt acknowledged that he did not see the man and woman using any motions that he would describe as "stabbing movements," but instead he saw motions that he described as "straight punch[es] or side punches." He said that he was pretty sure that both the man and the woman went through the victim's pockets and took something. He reiterated that he did not know what happened to the second van.

Officer Mike Wenzel, who responded first to Salinas's 9-1-1 call, testified that when he arrived at Times Market, the victim was lying in a pool of blood. He had been stabbed in the neck and his throat had been slashed. His wounds were consistent with knife wounds. He was not breathing or bleeding, and Wenzel concluded that he was dead. Wenzel tried to secure the scene while he waited for additional officers to arrive. He spoke with Salinas, Cervantes, and Butt, and learned that the suspects were both about 5'8" and wearing blue jeans and T-shirts. The woman was slim and between 20 and 30

years old. The suspects had fled in two red full-size conversion vans, with the woman getting into the passenger side of one van and the man getting into the driver's side of the other van. Wenzel gave this information to the police dispatcher, who issued an alert to all the officers in the city to be on the lookout for the suspects' vehicles.

Christina Chavez, one of appellant's accomplices, testified that, at the time of the offense, she and Angela Rodriguez lived together in San Antonio, but they had traveled to Corpus Christi to visit Rodriguez's family for the weekend. Rodriguez knew appellant, and the three of them drank and used drugs together for three or four days. When appellant came to Rodriguez's mother's house, Rodriguez snuck him in because her mother did not want him there. He was showing off a ridged knife. Rodriguez's mother kicked him out of her house when she discovered him, but he came back later that day with Rodriguez's sister, Roberta Garcia. Chavez, Rodriguez, and appellant left Garcia at her mother's house when they went out again. They pawned some things for drug money. Later, they went to appellant's friend's house where they used more drugs until they ran out. Chavez testified that in order to obtain money for more drugs, they agreed to grab someone and take his or her money, but they did not plan to hurt anyone. Only appellant had a weapon. They got into two maroon vans and started driving, searching for someone to rob. Chavez testified that she drove one van, with Rodriguez as a passenger, while appellant drove the other van. They pulled into the parking lot of Times Market where they saw a man carrying a bag to the dumpster. Rodriguez got out of the van and spoke to

him, and then returned to the van. Chavez then saw that appellant was fighting with the man. She told Rodriguez, who got back out of the van to see what was going on. Chavez testified that Rodriguez did not join in the fight but instead tried to get appellant off of the man. Appellant used the knife he had been showing off earlier to stab the man until he fell to his knees. After the man fell backward onto the ground, appellant pointed to Rodriguez, and then Rodriguez went through the man's pockets. Chavez did not see appellant go through the victim's pockets. Although she did not see Rodriguez take anything out of the victim's pocket, she saw Rodriguez drop $1.25 onto the console when she got back into the van. Chavez thought that the money came from the victim's pocket. Both appellant and Rodriguez had blood on them, so they found a place to rinse off.

Because they still did not have money for drugs, they committed an aggravated robbery, and then they attempted to commit another. Chavez testified that she waited in the van while appellant and Rodriguez committed these offenses. After the aggravated robbery, Rodriguez told Chavez to get into the van that appellant was driving, and from then on, the group rode together in one van. As they were driving away from the attempted robbery, they were seen by police and a chase ensued, but they eluded the police car that pursued them. They drove to an area of town known as "The Cut," where appellant drove the van into a lot that was overgrown with bushes and tall grass. They climbed out of the van and continued on foot. Chavez and Rodriguez were soon arrested, but appellant escaped. Chavez did not know what happened to appellant's knife, which

was never recovered, but she recalled that appellant told her he was keeping it as a souvenir.

The victims of the aggravated robbery and the attempted aggravated robbery also testified. April Metting, the aggravated-robbery victim, testified that while she was waiting in line at the drive-through window of a fast-food restaurant, a young woman walked up to the front of her car and asked to use her cell phone. The woman said that she had been in a fight and pointed to blood stains on her shirt. While Metting's attention was focused on the woman, a man came up behind her and reached into her open window with a ridged knife. He grabbed her by the back of her neck as he held the knife to her throat and demanded money. Metting testified that she was scared and asked them not to do this in front of her two-year-old son, who was sitting in the back seat, but the man just said, "Shut up, bitch." The woman also told her to shut up and give them her purse. She gave the man her money and her purse, and then the woman and man got into a van with another woman and left. Metting saw two vans parked nearby in the restaurant parking lot, but the suspects left together in only one of them. She said that she learned during the investigation that the young woman who had asked to use her cell phone was Chavez. She also identified a wallet and credit card that had been taken from her during the robbery and that were recovered from inside the Ford van.

Ruby Pena Hinojosa,[2] the victim of the attempted aggravated robbery, testified to a similar incident at the drive-through window of another fast-food restaurant. A maroon van pulled up next to her, and a thin woman with long, wavy hair got out and asked to use her cell phone. While they were talking, a man appeared at her driver's side window, put a serrated knife to her neck, and demanded money, but she was able to lean away from the knife and roll up her window. The man then went around to her passenger side window and began banging on the glass with the blade of his knife while his accomplice peered into her back windows. The victim feared for her life. At that point, she backed up her car and the suspects got into the van and left. She got a good look at the man's face and she later identified appellant in a photo lineup. These offenses took place within minutes of the Times Market offense.

Garcia, Rodriguez's sister, testified that, during the weekend leading up to the offense, she drank and did drugs with appellant, Rodriguez, and Chavez. Appellant showed her his knife, which had ridges or teeth on the side. She was out with them earlier on the day of the offense, but appellant dropped her, Rodriguez, and Chavez off at Rodriguez's mother's house. Later, when appellant returned to the house and picked up Rodriguez and Chavez, Garcia did not go with them. The next time she saw appellant was when he showed up at the front door after midnight, out of breath and covered in grass and dirt. He said that they had stabbed someone and that the police were after him.

---

[2] When this victim testified at trial, she was identified as "Ruby Pena Hinojosa," but she was identified in an indictment against appellant as "Ruby Pena."

He would not tell her where Rodriguez was. At one point, he said he stabbed Rodriguez, but at another point, he said that he thought she had gotten away. He had a big gash on his right hand that was bleeding heavily. He ran away when Garcia told him to leave.

Pamela Smith, a forensic scientist for the Texas Department of Public Safety, testified that DNA test results of samples taken from blood on the driver's-side door handle, steering wheel, and passenger door pocket of the Ford van that was recovered from the overgrown lot were consistent with appellant's DNA profile. Smith was able to say with a reasonable degree of scientific certainty that appellant was the source of those samples. Samples from other items found in the van were also consistent with appellant's DNA profile. Samples taken from blood on the steering wheel cover were consistent with a mixture of appellant's and Castro's DNA profiles.

Smith testified further that samples taken from blood on the gear shift lever, a T-shirt, and a vodka bottle found inside the Ford van were consistent with Castro's DNA profile. A sample taken from blood on an armrest inside the Dodge van that had been abandoned during the second robbery was also consistent with Castro's DNA profile. Samples from blood on the blue jean shorts Rodriguez was wearing when she was arrested were consistent with Castro's DNA profile. Smith was able to say with a reasonable degree of scientific certainty that Castro was the source of those samples.

Rey Fernandez, the medical examiner, testified about his examination and autopsy of Castro. He identified twenty-nine sharp force injuries consistent with knife wounds,

ten of which were stab wounds that penetrated Castro's body and nineteen of which were incised or slash-type wounds. Eight of the injuries were defensive wounds on Castro's right forearm and hand. The majority of the stab wounds were concentrated around Castro's head, neck, shoulders, and back. Fernandez also observed evidence of blunt force trauma on Castro's face and neck, as if he had been punched or kicked. A toxicology screen detected no alcohol or illegal drugs in Castro's body.

Officer James Gray testified that as he and his partner were heading toward the scene of the attempted robbery, they passed a red van matching the general description of the suspect vehicle. They shined a spotlight into the van and saw a man and woman in the front. Gray identified appellant in court as the man he saw driving the van. They made a U-turn and followed the van, turning on their lights and attempting to stop it. Initially, the driver of the van pulled over and stopped, but as soon as Gray opened the door of his patrol unit and stepped out, the driver of the van drove away. Gray got back into the car and he and his partner pursued the van. They sent out a description of the vehicle, its location, and the direction it was heading. The driver of the van accelerated to speeds of over 70 miles per hour and traveled through intersections without slowing down, until eventually the officers lost sight of the van on the north side of town. They again sent out information about where the van was last seen and the direction it had been heading.

Officer Michael Frakes testified that he responded to a call for all available units to move to the area of town where the vehicle pursuit was happening. He was familiar with the Port area, which was within a mile of where the van had last been seen, so he drove to that area to look around. While he was driving down a dark street, he saw "a red flash like a reflector." He shined his spotlight toward it and saw the right rear corner of a red van that had been driven off the road into a wooded area. Aware that the suspects might be dangerous, he turned off his spotlight and called for assistance. After another officer arrived, Frakes walked up to the van and discovered that it was empty, but the engine was still hot. Additional officers arrived to help search the area for the suspects. Frakes soon heard that another officer had arrested two women just beyond the brush where the van was found.

Officer Ralph Vasquez testified that he heard about the pursuit of the van while it was happening and he moved into a parallel pursuit so that he would be close at hand in case the van broke away from the pursuing unit. After learning that the van had broken away, he responded to the call for all available units to search for it. When he learned that the van had been found, he decided to circle around the brush area where it was located to see if he could find any suspects. He saw two white shapes moving, turned his headlights toward them, and discovered two women who matched the suspects' descriptions. He and another officer arrested them. Their clothes were soiled and bloody.

Based on the way the women acted, Officer Vasquez believed that they were under the influence of a mixture of alcohol and drugs.[3]

## SUFFICIENCY OF THE EVIDENCE

In his first point of error, appellant asserts that the evidence is legally insufficient to prove that he is guilty of capital murder. Within the body of this argument, appellant also asserts that Chavez's accomplice-witness testimony was not sufficiently corroborated. Thus, this point of error raises two distinct legal theories: (1) the evidence was legally insufficient; and (2) the conviction cannot be sustained under Article 38.14. *See Cathey v. State,* 992 S.W.2d 460, 462 (Tex. Crim. App. 1999) (expressly distinguishing legal and factual sufficiency standards from the accomplice-witness standard of review under Article 38.14). We will address each theory in turn.[4]

### A. Legal Sufficiency

Appellant concedes that there was direct evidence that he stabbed the victim, but he argues that the evidence presented at trial did not show beyond a reasonable doubt that he was responsible for the underlying offense of robbery. He asserts that Chavez's testimony that appellant pointed to Rodriguez after the victim fell to the ground and before Rodriguez went through the victim's pockets did not prove that appellant solicited,

---

[3] Appellant eluded the manhunt. He was finally apprehended near the Texas/Mexico border on February 20, 2008.

[4] Appellant's accomplice-witness-rule theory renders this point of error multifarious, but we will address both theories. *See Vasquez v. State,* 67 S.W.3d 229, 236 (Tex. Crim. App. 2002).

encouraged, directed, aided, or attempted to aid Rodriguez to commit the offense of robbery.[5] He also argues that the eyewitness who testified that he saw both appellant and Rodriguez going through the victim's pockets "effectively withdrew" his testimony on cross-examination.[6]

Due process of law requires that an appellant's conviction be supported by evidence sufficient to rationally prove all of the elements of the offense beyond a reasonable doubt. *See Wilkerson v. State,* 881 S.W.2d 321, 324 (Tex. Crim. App. 1994). In assessing the legal sufficiency of the evidence to support a conviction, an appellate court must consider all of the record evidence in the light most favorable to the verdict. *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The court must determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the defendant guilty of all the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

---

[5] Appellant also argues that Chavez's testimony is insufficient because Chavez committed perjury and was an interested witness and accomplice. He refers to portions of the record in which the prosecutor chided Chavez for attempting to minimize her involvement in the offenses, or told her that a jury would have trouble believing her. However, these events alone do not establish that Chavez committed perjury. It was for the jury, not this Court, to evaluate Chavez's credibility and weigh her testimony. *See Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).

[6] In his brief, appellant identifies this witness as Cervantes, but the record reflects that Butt was the witness who testified that both appellant and Rodriguez went through the victim's pockets.

In reviewing the legal sufficiency of the evidence, we look at events occurring before, during, and after the commission of the offense, and we may rely on actions of the appellant that show an understanding and common design to do the prohibited act. *Guevara v. State,* 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).  Each fact need not point directly and independently to the appellant's guilt, so long as the cumulative effect of all the incriminating facts are sufficient to support the conviction.  *Id.*  Under this standard, accomplice-witness testimony can be sufficient to support a conviction.  *Taylor v. State,* 10 S.W.3d 673, 684 (Tex. Crim. App. 2000).

As pled in the indictment, the offense of capital murder is committed when (1) a person (2) intentionally (3) causes the death (4) of an individual (5) while in the course of committing or attempting to commit robbery.  *See* TEX. PENAL CODE § 19.03(a)(2); *see also Wilkerson,* 881 S.W.2d at 323.  In this case, appellant does not challenge the sufficiency of the evidence with regard to his intent to cause Castro's death.  Instead, he challenges the legal sufficiency of the evidence with regard to whether he acted in the course of committing or attempting to commit robbery.  However, the record contains ample evidence to support the conviction.

Appellant was charged with intentionally or knowingly causing Castro's death by stabbing him while in the course of committing or attempting to commit robbery.  The jury charge provided that appellant was criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist in the commission of

the offense, he solicited, encouraged, directed, aided, or attempted to aid the other person to commit the offense. *See* TEX. PENAL CODE § 7.02(a)(2). Appellant now asserts that Chavez's testimony that he pointed to Rodriguez before she went through Castro's pockets is too vague to show that he solicited, encouraged, directed, aided, or attempted to aid Rodriguez to commit the offense of robbery. Therefore, he reasons, he was not criminally responsible for the robbery committed by Rodriguez.

As an initial matter, it is not necessary to determine whether appellant could be held criminally responsible for Rodriguez's conduct because the record contains evidence that appellant directly participated in the robbery. *See* TEX. PENAL CODE § 7.01(a) (a person is criminally responsible if an offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both). An eyewitness, Butt, testified that he saw both appellant and Rodriguez going through the victim's pockets. On cross-examination, Butt continued to say he was "pretty sure" that he saw both the man and woman going through the victim's pockets. This testimony was evidence that appellant directly participated in the robbery. *See Wesbrook,* 29 S.W.3d at 111.[7] Considering all the record evidence in the light most favorable to the verdict, we determine that a rational trier of fact could have found appellant guilty of all the elements

---

[7] Appellant also complains that he was not properly identified in court as the person who committed the offense. Specifically, he complains that, after Cervantes's in-court identification of appellant as the young man he saw attacking the victim, the prosecutor neglected to say, "Let the record reflect that this witness has identified the defendant." However, after the in-court identifications of appellant by Butt, Garcia, and other witnesses, the prosecutor did recite words to the effect of, "Let the record reflect that this witness has identified the defendant."

of capital murder beyond a reasonable doubt, even without the alternative theory of liability provided in section 7.02(a)(2).

Moreover, even assuming *arguendo* that the evidence was legally insufficient to find appellant guilty of directly participating in the robbery, the record also contains ample evidence that appellant was guilty of the underlying robbery under Penal Code § 7.02(a)(2). Appellant's act of pointing to Rodriguez was not the only evidence that he solicited, directed, encouraged, or aided the commission of the robbery. His act of stabbing Castro encouraged and aided the commission of the robbery, and it was also evidence of appellant's intent to commit the robbery. *See Young v. State,* 283 S.W.3d 854, 862 (Tex. Crim. App.), *cert denied,* 130 S.Ct. 1015 (2009) (assaultive conduct was evidence of intent to commit robbery). Additionally, Chavez's testimony that the group was looking for someone to rob in order to obtain drug money was evidence that, when appellant stabbed Castro, he did so in order to encourage or aid the commission of the robbery. *See, e.g., Guevara,* 152 S.W.3d at 50 & n.18 (motive is a circumstance indicating guilt, and intent may be inferred from circumstantial evidence). The subsequent aggravated robbery and attempted aggravated robbery, during which appellant used his knife in attempts to obtain drug money, provided further evidence of appellant's guilt. The evidence is legally sufficient to show that appellant was guilty of the underlying offense of robbery because he participated in it directly and because he was criminally responsible for Rodriguez's conduct.

*B. Accomplice Witness Rule*

We now turn to appellant's assertion that Chavez's testimony concerning both the murder and the underlying offense of robbery was not sufficiently corroborated under Article 38.14. Chavez, who pleaded guilty to aggravated robbery and received a sentence of twenty-five years for her role in this offense, was an accomplice as a matter of law. *See Brown v. State,* 270 S.W.3d 564, 567 (Tex. Crim. App. 2008) (accomplice as a matter of law is one who is susceptible to prosecution for the charged offense or a lesser included offense). The accomplice-witness rule mandates that a conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence tending to connect the defendant with the offense. Art. 38.14. However, accomplice-witness testimony in a capital murder case does not require corroboration concerning the elements of the aggravating offense, that is, the elements which distinguish murder from capital murder. *See McDuff v. State,* 939 S.W.2d 607, 613 (Tex. Crim. App. 1997); *see also May v. State,* 738 S.W.2d 261, 266 (Tex. Crim. App. 1987) (no need for corroboration as to underlying offense of robbery). Therefore, Chavez's testimony concerning the underlying offense of robbery did not require corroboration.

Unlike legal sufficiency, the accomplice-witness rule is not derived from federal or state constitutional principles. *See Druery v. State,* 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). Therefore, "tendency to connect" rather than rational sufficiency is the standard: the corroborating evidence need not be sufficient by itself to establish guilt.

*Cathey,* 992 S.W.2d at 462. The non-accomplice evidence must simply link the accused in some way to the commission of the crime, such that rational jurors could conclude that this evidence sufficiently tended to connect the accused to the offense. *Castillo v. State,* 221 S.W.3d 689, 691 (Tex. Crim. App. 2007); *Hernandez v. State,* 939 S.W.2d 173, 179 (Tex. Crim. App. 1997).

The sufficiency of the corroborating evidence is evaluated by eliminating the accomplice testimony from consideration and then examining the remaining portions of the record for any evidence that tends to connect the accused with the commission of the crime. *Solomon v. State,* 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Brown v. State,* 672 S.W.2d 487, 489 (Tex. Crim. App. 1984). Evidence that the defendant was in the company of the accomplice near the time or place of the offense is also proper corroborating evidence. *McDuff,* 939 S.W.2d at 613. If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, then the requirement of Article 38.14 has been fulfilled. *Cathey,* 992 S.W.2d at 462.

In this case, the following non-accomplice evidence tended to connect appellant to the offense:

(1)     Two eyewitnesses testified that they saw a man and woman beating and kicking the victim, who fell to the ground. The witnesses gave physical

descriptions of the assailants that were consistent with appellant and Rodriguez. One of the witnesses recognized appellant from prior contact as the man he saw attacking the victim. The man and woman left the scene in red vans. When the witnesses tried to help the victim, they saw that his throat had been slashed and he was bleeding heavily. He died within minutes of the attack.

(2)     Rodriguez's sister, Garcia, testified that appellant showed her a knife while they drank and did drugs together. She testified that appellant and his accomplices left the house together before the offense. After midnight, appellant showed up at her front door and told her that they had stabbed someone and the police were chasing him.

(3)     Shortly after the offense, a man and woman in a red van were observed committing and attempting to commit additional robberies. The man threatened the victims by holding a knife to their throats. One victim identified appellant as the man who attacked her. Property belonging to the other victim was found in the van.

(4)     A responding police officer identified appellant as the driver of the red van that he pursued shortly after the offense. The officer described the evasive maneuvers that appellant took to avoid being arrested.

(5)     A short time after the offense, a police officer observed a red van that had been driven into an overgrown lot. It was empty, but the engine was still hot. Appellant's accomplices were arrested nearby. DNA testing revealed that a mixture of appellant's and Castro's blood was on the steering wheel cover.

Hence, the requirements of the accomplice-witness rule set forth in Article 38.14 were satisfied. We hold that the evidence was legally sufficient and that the accomplice-witness testimony was sufficiently corroborated. Point of error one is overruled.

### C. Factual Sufficiency

In his second point of error, appellant asserts that the evidence is factually insufficient, in that it is too weak to prove that he is guilty of capital murder. This point

of error is premised on our decision in *Clewis v. State*. 922 S.W.2d 126 (Tex. Crim. App. 1996). However, in *Brooks v. State,* 323 S.W.3d 893, 895, 926 (Tex. Crim. App. 2010), we overruled *Clewis* and concluded that the legal sufficiency standard set forth in *Jackson v. Virginia,* 443 U.S. 307 (1979), is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *See Martinez v. State,* 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Point of error two is overruled.

## SUFFICIENCY OF FUTURE DANGEROUSNESS EVIDENCE

In his third point of error, appellant claims that the evidence is legally insufficient to support the jury's affirmative finding of future dangerousness. In evaluating the sufficiency of the evidence to support the jury's answer to the future-dangerousness special issue, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. *Solomon,* 49 S.W.3d at 362 & n.13. In determining the special issues, the jury is entitled to consider all of the evidence presented at both the guilt and punishment stages of trial. Art. 37.071, § 2(d)(1); *see also Young,* 283 S.W.3d at 863. The circumstances of the offense and the facts surrounding it may provide greater probative evidence than any punishment-phase evidence regarding the issue of future dangerousness. *Kunkle v. State,* 771 S.W.2d 435, 445-46 (Tex. Crim. App.

1986).  The jury may consider many factors when determining whether the defendant will pose a continuing threat of violence to society.  *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).  Habitual drug abuse may constitute evidence of future dangerousness. *Wilkerson,* 881 S.W.2d at 326.

The record shows that appellant had a history of disciplinary problems, arrests, and convictions, many of which were associated with drug and alcohol abuse.  His military records showed that, when he was nineteen years old, he was convicted in a summary court martial of being absent without leave for 163 days, using disrespectful language toward a non-commissioned officer, failing to obey a general order (underage drinking), and drunk and disorderly conduct.  Pursuant to a mental-health and substance-abuse screening, appellant was diagnosed with a personality disorder with borderline, antisocial, and dependent traits.  He did not meet the criteria for alcohol abuse and had no desire for treatment.

Appellant informed the mental-health evaluator that he had been suspended from school at the rate of nine or more times a year, typically resulting from "disrespecting" teachers and physically fighting with other students.  The mental-health evaluator determined that appellant had a history of physical violence and acting out and a high probability of acting out in the future.  Appellant was also diagnosed with depression.  He had attempted to commit suicide by jumping out of his window while awaiting court martial proceedings.  The evaluator determined that appellant was likely to continue to be

a danger to himself and recommended an expeditious administrative separation because appellant's problems were not expected to improve with available military mental-health treatment. As a result of his pattern of misconduct while in the military and the diagnosis of a personality disorder, appellant received an other-than-honorable discharge from the Marines.

A police officer testified that, within a month of appellant's discharge from the Marines, he was arrested for unlawful carrying of a weapon and possession of marijuana. Appellant's probation officer testified that appellant pleaded guilty to the weapon charge and received a nine-month term of deferred-adjudication probation, and the State asked the court to dismiss the marijuana charge. During the probation department's intake process, appellant reported that he began using drugs when he was twelve years old and that he used marijuana on a daily basis. He also completed two testing instruments designed to assess whether he had substance dependence problems that merited treatment. The results of these assessments indicated serious drug and alcohol problems. Appellant was arrested for public intoxication approximately three months after he received deferred-adjudication probation. A motion to revoke was filed, but the revocation warrant was not served until after appellant's arrest for the instant offense.

The police officer who arrested appellant for public intoxication testified that while he was searching for two people who were seen running from the scene of a disturbance, he found appellant crouched down on the back patio of a private residence.

Appellant, although drunk, was initially cooperative and polite, but he started "running his mouth" while being handcuffed. He tried to pull away from the officer as they were walking out of the yard. When the officer swept appellant's legs out from under him, appellant became cooperative again. He told the officer that he was recovering from a gunshot wound.

The police officer who interviewed appellant at the hospital when appellant was the victim of a shooting testified that he was drunk and uncooperative. Appellant had sustained two gunshot wounds, but he refused to answer any questions and said that he did not want to get his friends involved. The officer thought that appellant was probably hiding something because it was unusual for someone with such serious injuries to refuse to talk to a police officer. She testified that in her opinion, appellant was not peaceable and law-abiding.

Appellant's father testified in mitigation. After this testimony, counsel informed the court outside of the presence of jury that appellant had instructed him not to call any more witnesses. Appellant testified and confirmed that he did not want to present any more witnesses. The expert witness whom counsel had intended to call in mitigation testified that he had spoken with appellant about this decision and believed that appellant was competent and was making a considered decision.

In accordance with appellant's instructions, defense counsel made the following closing argument:

> May it please the Court and Counsel for the State and ladies and gentlemen of the jury, I'm reading from the Holy Bible, the New International [V]ersion, Psalm 51, verse 3. "For I know my transgressions and my sin is always before me. Amen."

Viewing the record as a whole, we conclude that a rational trier of fact could have found beyond a reasonable doubt that there was a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. The circumstances of the offense, appellant's behavioral and substance-abuse problems, and his lack of regard for authority and the law established future dangerousness. A rational trier of fact could view the instant offense as an escalation of appellant's behavioral problems and an example of the lengths to which he would go to support his substance-abuse habits. Similarly, in view of the fact that appellant's conduct had continued to deteriorate in spite of disciplinary action and criminal convictions, a rational trier of fact could determine that appellant was incorrigible, despite his young age at the time of the offense. Based on all of the evidence presented at the guilt and punishment phases, a rational trier of fact could have found beyond a reasonable doubt that there was a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. Point of error three is overruled.

In his fourth point of error, appellant claims that the evidence is factually insufficient to support the jury's affirmative finding of future dangerousness. We have repeatedly held that we will not conduct a factual sufficiency review of the jury's future-dangerousness determination. *See McGinn v. State,* 961 S.W.2d 161, 169 (Tex.

Crim. App. 1998); *see also Williams v. State,* 270 S.W.3d 112, 138 (Tex. Crim. App. 2008) ("We do not apply a factual-sufficiency review to the jury's answer to the future-dangerousness special issue"). More importantly, we have overruled the decision upon which appellant's claim relies. *See Martinez,* 327 S.W.3d at 736. Point of error four is overruled.

EXTRANEOUS OFFENSE EVIDENCE

In his fifth point of error, appellant claims that the trial court erred in admitting evidence of the subsequent aggravated robbery and attempted aggravated robbery at the guilt phase. He appears to assert that the parties and the court understood before trial that this evidence would be admitted at the punishment phase only, and so introducing and admitting this evidence at the guilt phase constituted a Rule 404(b) notice violation. *See* TEX. R. EVID. 404(b).[8] He also argues that this evidence was inadmissible character evidence under Rule 404(b) because the State did not need it in order to prove a common scheme or plan to rob Castro. He argues further that this evidence was inadmissible under Rule 403 because it was more prejudicial than probative.

*A. Rule 404(b) Notice*

The record shows that appellant filed a general discovery motion that included a request under Rule 404(b) for notice of the State's intent to introduce, in its case-in-chief, evidence of "other crimes, wrongs, or acts not arising in the same transaction as the

---

[8] Unless otherwise indicated all references to Rules refer to the Rules of Evidence.

offense charged." This request was granted during a hearing on October 3, 2008. At that time, the indictment in four counts charged appellant with four offenses: the instant capital-murder offense, the subsequent aggravated robbery and attempted aggravated robbery, and evading arrest with a vehicle. The prosecutor presented the testimony of the victims of the subsequent robberies at this hearing. He also explained that he did not expect to have any evidence requiring Rule 404(b) notice because the offenses he wanted to introduce were already alleged in the indictment.

Defense counsel later filed a motion to sever the capital-murder charge from the other counts of the indictment. That motion was granted during a hearing on October 21, 2008. At the hearing, defense counsel explained that he was requesting the severance because he had become concerned about the potential adverse effects of exposing veniremembers to allegations of multiple offenses during jury selection. The prosecutor then explained that he still intended to introduce evidence of the subsequent offenses at the guilt phase, and that he did not believe that the severance would keep out such evidence:

> [STATE]: [P]reviously we had a . . . discovery motion, it's a 404(b) motion, and I want to make sure and I think Defense Counsel has already reiterated that, that I – even though the counts are severed, the State still intends to bring the evidence from Count[s] 2, 3 and 4 into the case in chief as – as the same transactional context or res gestae of the offense, and I believe [defense counsel] has already told us at a previous hearing that he had no objection to that, . . . and he is not going to object to the introduction of that even though the jury will not be charged on that; is that correct?

[DEFENSE]:  At punishment, you mean.

[STATE]:  No, sir, I'm talking about in [the] case in chief we have – they're charged with one crime of . . . capital murder. The State is intending since these incidents all happened right at the same time that we do intend to introduce that evidence into the case in chief.

THE COURT:  As a 404(b).

[DEFENSE]:  As an extraneous offense and I don't really think I need to argue that. That's clearly going to be admissible in that regard.

THE COURT:  Well, at least you've given him notice and he can fight about it.

[DEFENSE]:  We have notice, Judge, and then we can still – we can still lodge whatever objections we feel are necessary to protect the record –

THE COURT:  Sure.

[DEFENSE]:  – and our client's best interest in the matter but . . . I think what [the prosecutor] is trying to say or establish is that I have already waived some sort of objection to that?

[STATE]:  No, what I meant was it was understood since all the cases were going to be tried together all that evidence was going to come [in] together.

[DEFENSE]:  Oh, I understand.

[STATE]:  I want the Defense Counsel to know that – and the Defendant to know that just because he's going to have a Jury Charge on capital murder, that's not to say that other evidence is still going to come in [sic]. He's not going to be able to limit just to the killing of Pablo Castro. The State . . . intends to introduce that evidence of Count 2, Count 3 and Count 4 in the case in chief.

THE COURT:     And so basically what he's saying is he's going to try to move this in 404(b) and you just need to know that because you've asked for notice –

[DEFENSE]:     That's correct.

THE COURT:     – and I think the other point is that even if the Court doesn't allow it in on 404(b) I – if he gets convicted of capital murder –

[STATE]:     It would come in.

THE COURT:     – he certainly gets to prove it up.

[DEFENSE]:     I understand.

THE COURT:     Okay.

[DEFENSE]:     And, of course, if he doesn't get it in under 404(b) he'll get it in under 37.07.

THE COURT:     Yeah.

[STATE]:     I just want to make sure, . . . Counsel and the client have discussed the fact that just because he's limi[t]ing what he's going to be charged with that may not limit the evidence that's going to be presented.

In other words, I don't intend to introduce evidence of just the capital murder case, I intend to introduce all that evidence in the case in chief so I believe it would be coming in anyway, whether he severs it or not.

THE COURT:     Okay.

[STATE]:     Has [defense counsel] conveyed that to his client and his client fully understands that?

[DEFENSE]:     I have, Your Honor.

* * *

THE COURT:     And you are aware that . . . I don't know what this Court is going to do at this point, I'll have to wait and have a hearing on the issue but it may very well be that . . . the evidence may come before the jury in the case in chief, and if not then, certainly at punishment.

You understand that?

[DEFENDANT]:  Yes, I understand that, Your Honor.

In this colloquy, defense counsel plainly stated that he understood that the State still intended to introduce evidence of the subsequent offenses during the presentation of its case in chief at the guilt phase. Appellant failed to preserve this matter for appellate review because he did not challenge the prosecutor's representations at the admissibility hearing that the State's notice to the defense was adequate, and he did not object at trial that the defense did not have adequate notice of the State's intent to introduce evidence of extraneous offenses.

## B. Rule 404(b) Character Evidence

The hearing on the admissibility of this evidence was held on October 29, 2008.[9] In the first part of that hearing, the State presented evidence of the offense of evading arrest with a vehicle. Next, the prosecutor argued that the evidence of the aggravated robbery, attempted aggravated robbery, and evading arrest should come in as same-transaction contextual evidence or as extraneous-offense evidence tending to show

---

[9] At the beginning of the hearing, the trial court announced, "We are here for two reasons. One, we were going to talk about the [jury] list, . . . we'll do that in a little bit. . . . We're also here because [the prosecutor] intended to introduce extraneous offenses, 404(b) at the time of trial, as I understand it."

motive, intent, plan, preparation, identity, "and such." He asserted that the aggravated robbery and attempted aggravated robbery offenses showed appellant's intent to rob Castro, and that the evading arrest offense was evidence of flight that demonstrated a consciousness of guilt.

At this hearing, defense counsel did not challenge the admissibility of the extraneous-offense evidence under Rule 404(b), but instead argued that evidence of the robbery and attempted robbery offenses should not be admitted because such evidence would be more prejudicial than probative under Rule 403. Counsel acknowledged that the State sought to introduce evidence of these offenses to show appellant's intent to rob Castro in the instant case, but he argued that allowing the State to introduce this evidence would provide a "back door" means of prejudicing the defense. The prosecutor responded that appellant's intent to commit robbery was an element of the charged offense that the State had to prove, and so the evidence was admissible on that basis. *See, e.g., Johnson v. State,* 68 S.W.3d 644, 650 (Tex. Crim. App. 2002) (evidence of extraneous offenses that tended to establish robbery element of capital murder was admissible). The trial court then ruled that these offenses were admissible because they were "very close in time, same evening, same motives, operandi."

Defense counsel responded that he might "reurge [his] motion" when the issue came up at trial in order to preserve error. However, we have not found any motions challenging the admissibility of this evidence. Nor have we found any reference during

the trial to such a motion, or any objection referring to the admissibility of extraneous offenses or unduly prejudicial evidence, and appellant does not direct us to any. *See* TEX. R. APP. P. 38.1(i); *Roberts v. State,* 220 S.W.3d 521, 527 (Tex. Crim. App. 2007) (a party has an obligation to make appropriate citations to the record in support of his argument, and an appellant procedurally defaults error by failing to include a matter in the record necessary to evaluate his claim).

Appellant's complaint that this evidence was not admissible under Rule 404(b) is not preserved because appellant never objected on this basis. *See Montgomery v. State,* 810 S.W.2d 372, 387 (Tex. Crim. App. 1991) (in order to preserve error on appeal, the opponent of evidence of other offenses must timely object, preferably by stating that such evidence is inadmissible under Rule 404(b), but ordinarily an objection that such evidence is not relevant or constitutes an extraneous offense is sufficient). The Rule 404(b) discovery motion, filed before the counts in the indictment were severed, was part of a general motion for discovery and was limited to requesting notice; it did not purport to challenge the admissibility of any evidence. *See Cook v. State,* 858 S.W.2d 467, 474 (Tex. Crim. App. 1993) (when the complaint on appeal differs from that made at trial, the error is waived, and an objection stating one legal basis may not be used to support a different legal basis on appeal). Appellant does not refer us to any motion or objection challenging the admissibility of extraneous-offense evidence. Moreover, the evidence was admissible.

## C. Rule 403

Appellant's complaint that the trial court erred by overruling his objection to this evidence under Rule 403 fails on the merits.[10] Rule 403 provides that evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, by considerations of undue delay, or needless presentation of cumulative evidence. *Solomon,* 49 S.W.3d at 366 & n.26. In making this determination, a trial court must balance:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State,* 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). These factors may blend together in practice. *Id.* at 642.

The balance between the probative value and the countervailing factors set out in Rule 403 is slanted toward the admission of relevant evidence. *De La Paz v. State,* 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). As long as the trial court's ruling is within the zone of reasonable disagreement, there is no abuse of discretion and the ruling will be

---

[10] The trial court's overruling of appellant's Rule 403 objection during the pretrial admissibility hearing was sufficient to preserve this claim for appeal, so long as appellant did not affirmatively waive the claim during trial. *See Moraguez v. State,* 701 S.W.2d 902, 904 (Tex. Crim. App. 1986). The State does not argue, and our review of the record does not reveal, that appellant waived this claim.

upheld. *Id.* at 343-44. Further, if the trial court's evidentiary ruling is correct under any applicable theory of law, it will not be disturbed even if the court gave a wrong or insufficient reason for the ruling. *Sewell v. State,* 629 S.W.2d 42, 45 (Tex. Crim. App. 1982).

In this case, the extraneous-offense evidence was highly probative because it made facts of consequence more likely. *See Johnson,* 68 S.W.3d at 650-52. First, it made the fact of appellant's identity as the murderer more likely. *See id.* at 651. At trial, appellant placed his identity in issue when he cross-examined Cervantes, pointing out that the police report of Cervantes's statement did not mention that Cervantes recognized Castro's assailant, and questioning Cervantes about his nearsightedness, the distance from the car wash to the Times Market parking lot, and the brief opportunity he had to observe the suspects. Appellant also cross-examined Butt about whether he had seen appellant moving his arm in a stabbing motion, emphasizing that Butt recalled "a punching motion" but not "any stabbing movements." He raised the possibility that Rodriguez was the murderer when he cross-examined Chavez about whether she saw Rodriguez stabbing Castro, and he questioned the medical examiner about whether more than one knife might have been used.

Additionally, the subsequent offenses were similar to the charged offense. *See Johnson,* 68 S.W.3d at 650-51. In the subsequent offenses, a female accomplice distracted the victim so that appellant could approach from behind with a knife that he

held to the victim's throat while demanding money. In the charged offense, a female accomplice approached Castro and spoke with him before appellant attacked him. Castro's throat was slashed and cut multiple times, and his money was taken. The victims of the subsequent offenses gave descriptions of the suspects, knife, and vehicle that were similar to those given by witnesses to the charged offense.[11] Particularly in view of their close timing and proximity to the charged offense, these offenses were relevant to show appellant's identity as the murderer.

Second, this evidence made the fact of appellant's intent to rob Castro more likely. *See De La Paz,* 279 S.W.3d at 349. To establish the "murder in the course of robbery" theory of capital murder, the State was required to show that the murder was committed during the course of the theft rather than the theft being an afterthought. *See Johnson,* 68 S.W.3d at 650. This evidence placed the charged offense in the context of the scheme carried out that night and tended to establish a conspiracy between appellant and his

---

[11] Appellant now asserts that the testimony of the victims of the subsequent offenses "raised the emotional level of the trial" and therefore suggested a decision on an improper basis. However, he did not object to this specific testimony before or during trial. Although the victims testified at a pretrial hearing and appellant had notice that they would testify at trial, appellant did not single out their testimony as being unduly prejudicial at any time before or during trial, and the trial court was not required to *sua sponte* sift through the evidence. *See, e.g., Roberts,* 220 S.W.3d at 532 (attack on victim-impact testimony in general, advanced before any testimony was heard, did not place the trial court on notice that appellant would find particular testimony objectionable); *Ladd v. State,* 3 S.W.3d 547, 572 (Tex. Crim. App. 1999) (trial court was not required, in the face of a global hearsay objection, to sift through an exhibit and segregate the admissible portions from the inadmissible portions).

accomplices. *See, e.g., id.* at 651.[12] Appellant challenged his involvement in the underlying robbery offense by cross-examining Cervantes about whether he recalled seeing anyone going through Castro's pockets and raising the possibility that the police had suggested this detail to Cervantes while they were taking his statement. In closing argument, appellant did not deny that he murdered Castro, but he argued that he did not plan or intend to rob Castro and that he murdered Castro because of something else that transpired in the parking lot. At the charge conference, appellant requested and received a jury instruction on the lesser-included offense of murder. In light of the State's burden of proof and the matters placed in issue by the defense, the probative value of this evidence was not substantially outweighed by any prejudice it may have caused.

We hold that the trial court did not abuse its discretion in determining that this evidence was admissible under Rule 403. Point of error five is overruled.

## JURY INSTRUCTIONS AT PUNISHMENT

In his sixth point of error, appellant complains of "egregious error in the instructions to the jury at punishment," in that the jurors were not told what to do if they could not agree on the answer to the first special issue. Appellant does not complain

---

[12] Appellant now argues that the State did not need this evidence to show that he and his accomplices had a common scheme or plan because the State had Chavez's "unassailed" testimony to that effect. However, Chavez's testimony could not sustain a conviction unless it was corroborated by other evidence tending to connect appellant with the offense. Art. 38.14; *Solomon,* 49 S.W.3d at 361. Further, Chavez acknowledged at trial that the terms of her plea agreement with the State required her to testify against appellant. During cross-examination, defense counsel challenged her credibility by implying that if her testimony minimizing her role in the offenses was true, then her sentences of twenty-five years were excessive.

about the written jury instructions, which were correct.  Rather, appellant's specific

complaint is that the trial judge misread the written jury instructions pertaining to the first

special issue.

The record shows that the trial court prefaced the reading of the jury instructions as

follows:

> All right, ladies and gentlemen, we are at the point where once again I read
> you the Charge and the lawyers will argue the case to you.[13]

Immediately before the challenged misreading, the court read:

> "The burden of proof in Special Issue No. 1 rests upon the State, and it must
> prove the affirmative of such issue beyond a reasonable doubt.[14]

> "You are instructed that you may not answer Special Issue No. 1 'Yes'
> unless all of the jurors agree to such answer.  Further, you may not answer

---

[13]  Before reading the instructions at the guilt phase, the trial court gave a more extensive explanation of this process as follows:

> All right.  Ladies and gentlemen of the jury, we are at the point at the trial where
> I'm going to read the Charge to you, that is, for those of you that have been on the
> jury before you know what this is.  This is basically like your instruction booklet.
> I'm going to read the Charge to you.  You do not have to memorize what I'm
> saying because you're going to get to take this back with you.  This is all the
> instructions you're going to get, and then after I read the Charge to you, then the
> lawyers will argue the case to you.

This explanation made it clear that the written instructions were the jury instructions to be relied upon during deliberations.  Nothing in the record suggests that the jurors attached more significance to the reading of the instructions at the punishment phase than they had at the guilt phase.  Indeed, the court's explanation at the punishment phase – "we are at the point where once again I read you the Charge" – was a reference back to the process the court followed at the guilt phase.

[14]  The transcript includes quotation marks to indicate that the court was reading directly from a written source.

this Special Issue No. – Special Issue 'No' unless ten (10) or more jurors agree. It is not necessary that members of the jury agree on what particular evidence supports a negative answer, that is, an answer of 'No' to Special Issue No. 1."

Special Issue No. 1, with forms for answers, is as follows:

"Special Issue No. 1. Is there a probability that the Defendant, John Henry Ramirez, Jr., would commit criminal acts of violence that would constitute a contributory [sic] threat to society?"[15] And there's a place for answers, and I'll read them to you.

"Answer: We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to Special Issue is – to this Special Issue is 'Yes,'" and there's a place for the presiding juror to sign, or, "We the jury, because of – because at least ten (10) jurors have a reasonable doubt as to the probability that Defendant would commit criminal acts of violence that would constitute a continuing threat to society, determine that the answer to this Special Issue No. 1 is 'No,'" and there's a place for the presiding juror to sign.

Then, as appellant points out, the court misread the following instruction:

"In the event that the jury is unable to agree upon Special Issue No. 2 (sic)[16] under the conditions and instructions outlined above, the Presiding Juror will not sign either form of answer to Special – of this Special Issue."

The court then continued reading:

"You are further instructed that if the jury makes an affirmative finding to Special Issue No. 1, that is, an answer of 'Yes,' then the jury shall answer Special Issue No. 2 below."

---

[15] Appellant does not challenge this particular misreading. The written jury instruction correctly contained the phrase "continuing threat" rather than "contributory threat."

[16] The "(sic)" at this point is part of the transcript. It constitutes some evidence that the court reporter understood that the trial court made a mistake by saying, "Special Issue No. 2."

Appellant argues that this misreading of the instructions, in which the trial court said, "Special Issue No. 2," instead of, "Special Issue No. 1," effectively failed to tell the jurors what to do if they could not agree on the first special issue. He asserts that this error violated the federal constitution's due process guarantee and the state constitution's due course of law provisions.[17] He acknowledges that there was no objection, but he claims that the harm is egregious because, if the jury had not been able to agree, the court would have imposed a life sentence. "Without direction, they agreed upon an answer that prompted a death sentence. The error was, consequently, not harmless beyond a reasonable doubt."

We question appellant's characterization of the misreading as jury-charge error because the written jury instruction was correct. At worst, any uncertainty over whether the verbal misreading or the correct written instruction was authoritative might have created an ambiguity. However, it is not necessary to resolve this matter because even if we assume *arguendo* that the misreading constituted jury charge error or created an ambiguity, appellant cannot show that he was harmed.

If no objection to an alleged jury charge error was made at trial, the appellant must show that the error created such harm that he did not have a fair and impartial trial. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Error creating egregious

---

[17] Appellant makes no distinction between his rights under the federal and Texas constitutions. Therefore we will treat them as being the same. *See Luquis v. State,* 72 S.W.3d 355, 364 (Tex. Crim. App. 2002).

harm is also described as error that goes to the very basis of the case or that vitally affects the defensive theory. *Ex parte Smith,* 309 S.W.3d 53, 63 (Tex. Crim. App. 2010). The actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Almanza,* 686 S.W.2d at 171.

Jury instructions which are not legally erroneous, but which might be ambiguous and therefore subject to an erroneous interpretation or application, are reviewed to determine whether there is a reasonable likelihood that they were applied in an erroneous way. *Luquis v. State,* 72 S.W.3d 355, 367 & n.37 (Tex. Crim. App. 2002). The reviewing court should use common sense in determining if there is a reasonable likelihood that the jury was misled. *Mireles v. State,* 901 S.W.2d 458, 460 (Tex. Crim. App. 1995). "A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Boyde v. California,* 494 U.S. 370, 378 (1990); *see also Saffel v. State,* 121 Tex. Crim. 444, 451-52 (Tex. Crim. App. 1932) (on motion for reh'g) (omission of the word "not" from one part of the jury charge was not reversible error where an intelligent mind, considering the charge in its entirety, would supply the missing word).

In this case, the trial judge plainly stated that he was reading the written jury instructions and forms. In doing so, he indicated to the jury that the written instructions were authoritative. After the parties made their closing arguments, the written

instructions and forms were given to the jurors during deliberations. The written portion that correctly stated, "In the event that the jury is unable to agree upon Special Issue No. 1, . . . the Presiding Juror will not sign either form of answer," immediately followed the forms that were to be completed by the presiding juror. The presiding juror signed the form indicating that the jury unanimously found that the answer to Special Issue No. 1 was "Yes."

On these facts, there is no reasonable likelihood that the jury was confused or misled by any alleged error or ambiguity. The context makes clear that the trial court simply misread one word of the written jury instruction. The court referred to "Special Issue No. 1" six times before incorrectly referring to "Special Issue No. 2," and then the court referred again to "Special Issue No. 1" while reading the language that instructed the jury on what to do in the event of an affirmative finding.

Finally, the misread instruction did not concern the jury's ability to agree or disagree on any special issue. The plain language of this instruction concerned only the presiding juror's conduct, directing him not to sign the forms in the event that the jury could not agree under the outlined conditions. Appellant does not argue, and there is no evidence, that the court's misreading so confused the presiding juror, who had the correctly worded written jury instruction before him during deliberations, that he felt compelled to sign the forms even if the jurors did not agree.

The record does not reveal any reasonable likelihood that the jurors were misled or confused by the challenged misreading.  Point of error six is overruled.

We affirm the judgment of the trial court.


Meyers, J.


Delivered: March 16, 2011
Do Not Publish